435 P.2d 36

Jack P. STEWART and Western Exploration & Development Co., an Arizona corporation et al., Appellants,

v.

Keaton C. GIBSON and Archie A. Gibson, Appellees.

No. 8247.

Supreme Court of Arizona.

In Banc.

Dec. 20, 1967.

Paul W. LaPrade, Allen L. Feinstein, Phoenix, for appellants.

Brandt & Baker, Yuma, for appellees.

BERNSTEIN, Chief Justice.

This is an appeal from a judgment for damages awarded Keith Gibson and Archie Gibson against Jack Stewart and the Western Exploration and Development Company, the appellants herein, and Frank Green who is not a party to this appeal. Jay Todd and Lucien Smith were also defendants in the court below, but the trial court found in their favor and they are not parties in this appeal.

Keith and Archie Gibson, hereinafter referred to as "Gibsons", contracted in writing to sell to the defendants Jay Todd and Lucien W. Smith four unpatented man-

ganese mining claims known as the Black Diamond Mine. Part of the purchase price was to be paid by royalties of fifteen per cent of the gross selling price of all the ore shipped from the mine. All the ore mined was to be sold to the General Services Administration of the United States Government, and all of it was to be milled at the Cibola Mill.

The Cibola Mill, referred to in the contract, was owned by Western Exploration and Development Company, hereinafter called Wexdel, a corporation whose president was Jack P. Stewart and whose auditor was Frank R. Green. Wexdel, Stewart, Green, Todd and Smith were the five defendants named in the original complaint in the action brought by the Gibsons. At all times material hereto, the defendant Todd was a regular salaried employee of Wexdel, and the defendant Smith was the owner of twenty per cent of the capital stock of the corporation.

Todd and Smith "entered into an agreement" with Wexdel "to mine and mill their ore." Stewart testified that he did not know whether the document was a formal written contract or not. The agreement to *mill* the ore was in writing and was introduced in evidence as Stewart's Exhibit 3. However, the exact nature of the arrangement, other than the agreement to mill the ore, between Wexdel and Todd and Smith, relative to *removing* the ore from the mine is not clear in the record.

A considerable portion of the ore which was mined was shipped to the General Services Administration on certificates indicating that its origin was from mines other than the Black Diamond Mine. Whether this was done for convenience, to confuse the record, or to prevent Gibsons from knowing that the ore was coming from their mine, is also not clear.

In January, 1958, the federal government withdrew the Black Diamond Mine from location and ordered the mining operations to cease. By Stewart's efforts, an extension was obtained from the government to June 19, 1958, and ore removed from the mine during this period was stockpiled at Ripley, Arizona. Gibsons' suit for unpaid royalties is based mainly upon shipment from the Ripley stockpile under certificates of origin signed by the defendant Green, on which the royalties due Gibsons amounted to $13,798.16. However, Gibson also claimed $2,800.00 for royalties on ore shipped from Ripley under Stewart's certificate of origin. Gibsons' claim thus totalled $16,598.16.

■ The contract between Todd and Smith and the Gibsons provided that in the event of default the sellers could terminate all of the rights of the buyers and all of the interests of the buyers would then terminate, in which case "buyers shall not be personally liable for any portion of the purchase price not then due and payable." The record shows that in August, 1958, Gibsons served upon Todd and Smith a fifteen day default notice, during which period the default was not remedied. Therefore, at the end of the fifteen days, all interest of Todd and Smith was lost, and they were liable only for such royalties as were then due and payable. At the time the default notice was served, all mining operations had ceased and the government had taken over the location. Todd and Smith had gone on to other ventures and whatever ore remained at Ripley was simply left there. This ore, abandoned by Todd and Smith, did not contain a sufficiently high percentage of manganese to be eligible for sale to the General Services Administration. However, at a later date, Wexdel Company bought some highly concentrated manganese ore and blended it with the ore that was left abandoned at Ripley. This rendered the manganese content high enough to make it saleable and it was sold to the government. After that disposition of the ore, conferences took place between the Gibsons and the defendant Stewart in an effort to determine how much Gibsons had coming for their royalties on the Ripley ore, but no figure was ever agreed upon.

Keaton Gibson testified that he was "satisfied that the Todd and Smith account, the ore shipped under certificates of origin in

the name of Todd and Smith, had been paid."

The trial court entered judgment in favor of the Gibsons against Stewart, Green and Wexdel Company in the amount of $13,-798.16 but not against Todd and Smith. The court made no findings of fact or conclusions of law. From it only Stewart and Wexdel Company have appealed.

The main thrust of Gibsons' argument in the trial court was that the arrangement between Todd and Smith, and Wexdel was an assignment of the contract originally made between Todd and Smith and the Gibsons. It was contended that if the assignment was not sufficient to be recognized at law, it was at least sufficient to constitute what is known as an equitable assignment; and that, therefore, Wexdel, having taken the benefit of the contract, must accept the burden of paying the royalty.

Wexdel and Stewart advance three defenses: One, that there was no assignment of any kind; two, that the assignees Wexdel, Stewart and Green did not assume the liabilities under the contract and therefore are not liable and the plaintiffs must look only to Todd and Smith since they are the only ones who signed the original contract; and three, that there can be no judgment against Stewart or Green personally because they were acting merely as corporate officers, even though the shipments were made under their individual certificates of origin.

With regard to the issue of equitable assignment, the following from 4 Corbin on Contracts, § 858, is pertinent:

"§ 858. Are the Rights of an Assignee 'Equitable' as Opposed to 'Legal'?

"Even before the amalgamation of law and equity that has taken place in most jurisdictions, the assignee of a contract right had an adequate remedy in the common law courts. In addition, those courts gave substantially the same protection to the obligor as the court of chancery had done. The various jural relations existing among the assignor, the assignee, the obligor, and other creditors and assignees, came to be substantially identical as recognized by the two systems of courts. In so far as these jural relations had been developed in equity, they were taken over by the courts of common law. Except for purposes of historical explanation, therefore, it became unnecessary to describe the assignee's right as a solely 'equitable' right. Not only unnecessary, it became misleading and injurious, causing false distinctions and unjust decisions in cases of partial assignments, perpetuating the survival of the notion that there is some universal and eternal distinction between an 'equitable' right and a 'legal' one, and tending to prevent the full realization by the courts that they are empowered and in duty bound to act as chancellors as well as judges and to apply the rules of equity in cases of conflict between the two systems."

\*   \*   \*   \*   \*   \*

"The various legal relations existing among assignor, assignee, obligor, and other persons vary, as matter of course, with varying circumstances. They can be stated, and are stated with substantial completeness by the American Law Institute in its Restatement of the law of contracts, without using the term 'equitable' and without attempting to explain the supposed distinctions between 'legal' and 'equitable.' If such usage is misleading to anyone, it is so only to those who have long ago had inculcated in their minds a usage and terminology that are rapidly disappearing, with their supposed 'fundamental' distinctions that are now capable of explanation only with the greatest difficulty."

The main difficulty with the equitable assignment argument is that there is no evidence of any kind offered by plaintiffs from which the court could find an assignment, legal or equitable. The written agreement pertained only to the *milling* of the ore *after* it was removed. Because of the facts that Smith was a stockholder in Wexdel, that Todd was an employee of Wexdel, and that Wexdel already had a

bookkeeper on its payroll, the chances are that the parties gave no thought whatever to the question of what kind of an arrangement they were entering into. The record shows that the mining was usually done, not by the employees of Wexdel, but by contracting to others. Since the receipts from the sale of the ore went to Wexdel, it was natural that Wexdel should pay the cost of removing the ore. Whether Wexdel was acting as an independent contractor, or as an agent, or as an employee of Todd and Smith is not clear, but it is clear that there is no evidence that they were acting as assignees under the original contract. Wexdel claimed that out of the proceeds which they received from the General Services Administration, they paid the costs of mining the ore, the costs of milling the ore, and such other expenses as were proper, and accounted to Todd and Smith for the balance. Wexdel, Green and Stewart contend that if Todd and Smith did not pay Gibsons the royalties that they should have paid out of the proceeds received from Wexdel, that is a matter between Todd and Smith and the Gibsons, and does not involve Wexdel, Green or Stewart.

We have no choice but to agree with this contention. Since neither Green, nor Stewart, nor Wexdel Company signed the original contract, the burden is upon the Gibsons to show that an assignment took place or that Wexdel, Stewart or Green were liable to them in some manner. This they failed to do.

Despite the dearth of pertinent facts, we think that it is clear that the Gibsons did not carry their burden of proof and failed to establish any liability upon Wexdel, Stewart or Green, under the theory of equitable assignment or otherwise. Other issues are raised, but because of our holding on the above points, it is unnecessary to consider them.

Judgment reversed.

McFARLAND, V. C. J., and STRUCKMEYER, UDALL and LOCKWOOD, JJ., concur.